UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:                                                      :
                                                            :
JESUP & LAMONT, INC. and                                    :      Case No. 10-14133 (ALG)
JESUP & LAMONT SECURITIES                                   :      (Jointly Administered)
CORPORATION,                                                :
                                                            :
                        Debtors.                :
                                                            :
------------------------------------------------------------x
MATTHEW C. HARRISON, JR.,                                   :
CONFIRMATION TRUSTEE                                        :
OF THE JESUP LIQUIDATING TRUST,                             :
                                                            :      **COMPLAINT**
                        Plaintiff,              :
                                                            :
- against -                                                 :      Adv. Pro. No. 12-_____ (ALG)
                                                            :
STEPHEN RABINOVICI and ALAN WEICH-                          :
SELBAUM,                                                    :
                                                            :
                        Defendants.             :
------------------------------------------------------------x

       Matthew C. Harrison, Jr., as Confirmation Trustee of the Jesup Liquidating Trust (the "Trustee"), by his attorneys Wilk Auslander LLP, for this Complaint herein alleges as follows upon knowledge as to himself and upon information and belief as to others:

       1.      The Trustee is bringing this action to redress a number of serious breaches by the defendants of the fiduciary duties they owed to the debtors Jesup & Lamont, Inc. ("JLI") and Jesup & Lamont Securities Corp. ("JLSC") (together, the "Debtors"). As set forth in more detail below, Rabinovici and Weichselbaum engaged in, among others, the following wrongful activities in breach of their fiduciary duties:

       (a)     failure over time to pay trust fund and other fiduciary taxes and obligations, primarily payroll taxes, followed by the transfer of the liability for such taxes and related payments from JLSC, which was a registered broker-dealer regulated by the Financial Industry Regulatory Authority ("FINRA") to the parent, JLI, which had the effect of

increasing the capital of JLSC for regulatory purposes, thereby enabling JLSC to remain in business for an additional five months after the transfer and to incur in that time over $8.5 million of losses;

(b) grossly improvident expenditures of company funds and incurring of liability on a new lease for expensive executive office space (including a large security deposit that ultimately was forfeited), at a time when the company's fortunes were unmistakably deteriorating to the point of insolvency;

(c) payment shortly before debtor JLI filed its petition of $250,000 on account of preexisting debt, which was made for the apparent purpose of preferring business associates of defendants and reducing defendants' guarantees of JLI's debt; and

(d) failing to remit to the Debtors' health insurance carrier the premium payments withheld from employees, which resulted in employees losing their health coverage and filing numerous large claims against the Debtors' estates.

2. Because of these numerous breaches of fiduciary duty, which continued for an extended period and resulted in the loss of millions of dollars, defendants should be required to pay compensatory damages to make the Debtors whole and punitive damages to make an example of these defendants who so egregiously and blithely harmed those who trusted them.

## PARTIES AND JURISDICTION

3. Debtor JLI filed a voluntary Chapter 11 petition in this Court on July 30, 2010. Debtor JLSC filed a voluntary Chapter 11 petition in this Court on September 24, 2010.

4. This Court approved the Amended Plan of Liquidation of the Official Committee of Unsecured Creditors under Chapter 11 of the Bankruptcy Code (the "Plan") by order dated October 6, 2011.

5. Pursuant to Articles V and VIII of the Plan, the Committee and the Trustee executed the Post-Confirmation Trust Agreement.

{00586552v6}2

586552v2

6. Under the terms of the Plan and Post-Confirmation Trust Agreement, the Trustee succeeded to the rights of the Debtors and acquired the Debtors' assets including the Debtors' causes of action.

7. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

8. This adversary proceeding is commenced pursuant to Rule 7001, *et seq.* of the Federal Rules of Bankruptcy Procedure and §§ 544, 547(b), 548, and 550(a) of title 11, United States Code (the "Bankruptcy Code").

9. Venue in this Court is proper pursuant to 28 U.S.C. § 1409 because this proceeding arises under, and is in connection with, a case under 11 U.S.C. § 101, *et seq.*

10. This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A)(F)(H), and (O).

11. Defendant Weichselbaum is a citizen of New York. He was the CFO of JLI and, for the last two months before JLI filed its petition, acted as the CEO of JLI.

12. Defendant Rabinovici is a citizen of New York and, until the time it filed its petition, was the Chairman of JLI.

## FACTS

13. JLI formerly was a publicly traded holding company. Its operating subsidiary, JLSC, was a registered broker-dealer, engaged in the securities business. From 2008 to 2010, JLSC operated branches in five states, employing approximately 190 people.

### A.  Mishandling of payroll tax liabilities

14. Considerably before the petition, JLSC stopped paying payroll taxes and related obligations. Instead the money was used to fund operations. By February 2010 the accumulated liability of JLSC for unpaid payroll taxes and related liabilities was at least $2.2 million.

15. This failure to pay payroll taxes and related liabilities on a timely basis created a large and growing nondischargeable liability that the Debtors were unable ever to repay. The defendants were well aware that failing to pay trust fund liabilities was extremely dangerous, but nevertheless caused the Debtors to fail to pay those liabilities. This was done in order to keep the Debtors artificially alive and operating past the date when they should have ceased operations.

16. The Debtors' insolvency would have been apparent much earlier, and at smaller levels of debt, had the defendants caused the Debtors to make payments of payroll taxes and related liabilities on a timely basis in the ordinary course of business, starting in.

17. As a result of defendants' breach of their fiduciary duty to operate the Debtors in compliance with applicable laws, including laws governing payment of payroll taxes and related obligations, the Debtors were caused to incur losses far beyond what they otherwise would have incurred.

**B.    Deceptive accounting for payroll tax and related liabilities**

18. Besides being in themselves a serious breach of the duties of care and loyalty, the unpaid payroll taxes further set the stage for an even larger breach of fiduciary duty. As a registered broker-dealer, JLSC was required to comply with minimum capital requirements under SEC Rule 15c3-1. As part of the regulatory regimen it imposes on broker-dealers under its regulatory supervision, JLSC had to file monthly "FOCUS Reports" that set forth the company's financial condition for purposes of demonstrating compliance with the minimum capital requirements of Rule 15c3-1.

19. As of January 2010, JLI owed an intercompany debt to JLSC of approximately $2.45 million. This intercompany debt was not evidenced by a note or other document, nor was it due on a specific date. It also did not carry interest. Although for accounting purposes the receivable JLSC

held from JLI was an asset of JLSC, for purposes of regulatory net capital calculations the intercompany receivable had to be ignored and could not be counted as an asset that contributed to the calculation of net capital. This receivable also would not have appeared in the consolidated financial statements of the combined entities because it would have been cancelled out by consolidating entries.

20. The intercompany receivable on JLSC's books dropped to $1.976 million in January 2010. According to the FOCUS report filed with the SEC for the month ended January 31, 2010, JLSC's net capital for regulatory purposes as of the end of January 2010 came to $460,201. The minimum net capital that JLSC was required to have in order to comply with Rule 15c3-1 as of January 31, as reported on the FOCUS report, was $365,133. JLSC thus had a net capital "cushion" of less than $100,000.

21. During February 2010, management—at the direction of CEO Alan Weichselbaum and with the approval of Rabinovici—caused book entries to be made that moved almost $2.2 million of payroll tax liabilities of the operating company, JLSC, "upstream" to JLI in return for cancellation of the intercompany balance. For financial reporting purposes this was a wash because the entries were entirely internal to the consolidated group, but for purposes of calculating regulatory net capital to the SEC and reporting regulatory net capital on the FOCUS reports, the effect was dramatic. A huge liability disappeared from JLSC's books. Even though on its FOCUS report for February 2010, JLSC reported a loss of $588,705, JLSC reported net capital of $434,728 for the period ended February 26, 2010. This enabled JLSC to stave off regulatory action to shut down JLSC for inadequate capital.

22. These bookkeeping entries appear not to have been based on any economic substance or any genuine transaction. Without the artificial decrease of liabilities, JLSC would have

been far out of compliance with net capital requirements and thus subject to being closed down by FINRA in the near term.

23. In the ensuing months (with one exception), the losses at JLSC continued. They were as follows:

| | |
|---|---|
| March | ($1,845,849) |
| April | ( 374,950) |
| May | 65,737 |
| June | ( 1,862,428) |
| July | ( 4,502,004) |
| | ($8,519,494) |

24. Thus, the February entries that "upstreamed" the payroll tax liabilities to JLI succeeded in keeping JLSC's doors open for five more months. But the effect of these entries over the medium (and certainly long) term was catastrophic: JLSC incurred enormous losses, and inflicted on its creditors enormous losses, that would not have been incurred had the entries not been made and had matters taken their course through the regulatory process – as in fact happened, finally, in July, when FINRA shut JLSC down for noncompliance with minimum capital requirements. Absent the improper upstreaming of the liabilities, the end would have come for the Debtors far earlier and with a much smaller scope of insolvency (and thus less injury to creditors).

C.  **Improvident Lease**

25. One month after the book entries mentioned above that had the effect of masking JLSC's insolvency, JLI (which, at that point, was a holding company for which JLSC was the sole operating business) entered into a long term lease dated March 3, 2010 for the 17th floor at 623 Fifth Avenue in New York (the "NY Lease"). The lease term was for a period from March 3, 2010 to August 31, 2017. The initial annual rental for the first 3½ years of the NY Lease was $941,590, payable in monthly installments of $78,465.83. In addition, the lease required JLI to pay a security deposit in the amount of four months' rent, or $313,863, which JLI paid.

26.     JLSC was shut down by FINRA on June 18, 2010, just over three months after the NY Lease term commenced. JLI filed a Chapter 11 petition on July 30, 2010, and JLSC filed a Chapter 11 petition on September 24, 2010. By order dated August 25, 2010, the Bankruptcy Court approved rejection of the NY Lease. By that time, however, JLI had paid to the landlord a substantial amount of rent under the NY Lease. In addition, the rejection generated a prepetition general unsecured claim for $900,000. In partial satisfaction of that claim the landlord applied the entire $313,863 that the defendants had caused the Debtors to pay as a security deposit, which otherwise would have been property of the estate.

27.     Because JLI/JLSC was functionally insolvent at the time it entered into the Lease, made the rental payments and paid the security deposit, this lease should not have been entered into at all, much less on its stated terms. In their respective capacities as Chairman and CEO, Rabinovici and Weichselbaum breached their fiduciary duties to the Debtors and their creditors by engaging in this highly and obviously improvident transaction, which was a waste of corporate assets.

### D.     Self-interested payment of preferences

28.     On February 18, March 26, and June 1, 2010, J&L signed promissory notes to 126-30 Northern Boulevard, LLC (126-30 NB), in the amounts of $400,000, $500,000 and $500,000, respectively. Between May 7 and June 11, 2010 J&L wire transferred to 126-30 NB the sum of $31,000, representing fees paid in connection with reissuing the new June 1, 2010 $500,000 note to replace the prior $500,000 note. In connection with issuance of the new note, the prior guarantors were replaced by new guarantors. In particular, Mr. Fellus on behalf of JOAB LLC was replaced as guarantor by Messrs. Weichselbaum and Rabinovici.

29.     On June 28, 2010, J&L transferred $250,000 to 126-30 NB. This transfer was made at the behest, and with the knowledge and approval, of Mr. Rabinovici and Mr. Weichselbaum. At

the time Mr. Rabinovici and Mr. Weichselbaum caused or permitted this transfer to be made, JLSC had already received written notifications from FINRA (on June 18 and June 25) that JLSC was out of compliance with minimum capital requirements. It should have been apparent at the time to even a casual observer that J&L was unable to continue the business of its one operating subsidiary and would have to shut down. It also was apparent at the time that the Debtors were insolvent.

30.    Nevertheless, the most senior officers caused the Debtors to pay a preference to 126-30 NB, thereby depleting the Debtors' cash, and depriving other creditors of access to the cash. This payment was made for two purposes:

(a)    to prefer persons with whom Mr. Rabinovici or Mr. Weichselbaum, or both, had relationships (such as, for example, the principals of 126-30 NB), in the interest of preserving their future ability to do business with them or otherwise to preserve their relationships; this conduct is of a piece with the improper use of JLSC's money to repay an unsecured debt owed to New Jersey National Bank; and

(b)    to reduce the amount of the guaranteed debt so that Messrs. Rabinovici and Weichselbaum's exposure on the guarantees would be correspondingly reduced. In this manner the defendants preferred their own interests ahead of the interests of the Debtors and their creditors.

31.    By thus diverting money out of the estate, Messrs. Rabinovici and Weichselbaum breached their fiduciary duty to the Debtors.

E.    **Misapplication of health insurance premium funds.**

32.    During May, 2010, and perhaps earlier, JLI and/or JLSC collected from their employees amounts for health insurance premiums. The officers of the Debtors did not remit these

premiums to the Debtors' health care provider, Aetna. Instead the defendants caused the Debtors to use those funds for other purposes.

33. As a result, the Debtors' employees' health insurance was terminated during the latter part of May, 2010, requiring the employees to incur an undetermined liability for uncovered health care costs. These employees have, in turn, filed claims against the Debtors for their losses resulting from the cancellation of the health insurance.

34. A further result of the defendants' having made available for the Debtors' day-to-day use the health insurance premium monies was to artificially extend the life of the Debtors and deepen their insolvency.

35. To the extent the Debtors are liable to their former employees for amounts the employees had to pay out of their own pockets that should have been paid over by the Debtors from amounts set aside for that purpose, Messrs. Rabinovici and Weichselbaum are liable to make good to the Debtors. In addition, they are liable for the losses the Debtors incurred during the period that the defendants were causing the Debtors to make use of the health insurance premium monies.

### FIRST CLAIM FOR RELIEF

36. The Trustee incorporates the foregoing allegations by reference.

37. Defendants' failure to ensure that payroll taxes and related obligations were paid timely and fully was a breach of their fiduciary duties to the Debtors. This breach marked the Debtors' insolvency and caused the Debtors to remain in business and incur losses beyond what they would have incurred had the requisite payments been made timely, with the predictable result that the Debtors' financial desuetude would have become apparent earlier.

38. Defendants are liable for all the Debtors' losses incurred as a result of their operating while their insolvency was camouflaged by having available for operations the cash that should have been used for trust fund payments.

## SECOND CLAIM FOR RELIEF

39. The Trustee incorporates the foregoing allegations by reference.

40. The book entries by which JLSC's obligation for payroll taxes was up-streamed to JLI reflected no economic substance and were made solely to "game the system" of calculating JLSC's regulatory net capital by decreasing its operable liabilities.

41. As a result of this sham accounting, JLSC was able to postpone the day of reckoning when FINRA would shut it down for failure to meet net capital requirements. As a result, the Debtors incurred over $8.5 million of losses they would not otherwise have incurred.

42. Directing or permitting this sham accounting was a breach of defendants' fiduciary duties to the Debtors.

43. As a result of this breach of fiduciary duty, the defendants should be required to make the Debtors whole for the losses defendants caused.

## THIRD CLAIM FOR RELIEF

44. The Trustee incorporates the foregoing allegations by reference.

45. By entering into the New York Lease, and depleting estate funds with rich rental payments and a large security deposit at a time when the Debtors were manifestly insolvent, the defendants breached their fiduciary duties to the Debtors and caused corporate waste.

46. The defendants should be required to make the Debtors whole for the amounts they caused the Debtors to expend improvidently and irretrievably in connection with the lease.

## FOURTH CLAIM FOR RELIEF

47. The Trustee incorporates the foregoing allegations by reference.

48. The defendants breached their fiduciary duties by causing the Debtors to make preferential payments that operated to benefit the defendants personally.

49. The defendants should be required to make the Debtors whole for any unrecovered amounts of preferential transfers made to 126-30 NB.

## FIFTH CLAIM FOR RELIEF

50. The Trustee incorporates the foregoing allegations by reference.

51. By causing the Debtors to fail to remit health insurance premiums to Aetna, which led to the cancellation of coverage for employees, defendants caused the creation of enormous employee claims against the Debtors. In addition, the extra cash on hand used in operations masked the Debtors' insolvency, lending to further losses.

52. This was a breach of defendants' fiduciary duties for which they must make the Debtors whole.

WHEREFORE, the Trustee requests that judgment be entered in his favor as follows:

A. On the first claim for relief, at least $2,200,000 together with punitive damages to make an example of the wrongdoers;

B. On the second claim for relief, at least $8,519,494 together with punitive damages to make an example of the wrongdoers;

C. On the third claim for relief, at least $701,129.84 together with punitive damages to make an example of the wrongdoers;

D. On the fourth claim for relief, at least $250,000 together with punitive damages to

{00586552v6} 11

586552v2

           make an example of the wrongdoers;

E.     On the fifth claim for relief, compensatory damages to be determined at trial together with punitive damages to make an example of the wrongdoers;

F.     Costs, interest and attorneys fees; and

G.     Such other and further relief as may seem to the Court just and proper.

Dated: New York, New York
       March 14, 2012

                                       WILK AUSLANDER LLP

                                       By: _____
                                             Stuart M. Riback
                                             Eric J. Snyder

                                       1515 Broadway, 43rd Floor
                                       New York, NY 10036
                                       (212) 981-2300

                                     *Attorneys for Plaintiff Matthew C. Harrison, Jr. as Post-Confirmation Trustee of the Jesup Liquidation Trust*